# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

United States of America,

                           Plaintiff,         Case No. 22-cr-20249

v.                                    Judith E. Levy
                                         United States District Judge

Thomas Lee McKinney,

                                     Mag. Judge Jonathan J.C. Grey
                        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S SECOND OBJECTION TO THE PRESENTENCE INVESTIGATION <u>REPORT</u>

Defendant Thomas Lee McKinney filed four objections to the Presentence Investigation Report (PSR). This opinion and order addresses Defendant's second objection. On October 31, 2022, the Court held an in-person hearing on the objection and heard oral argument. For the reasons set forth below, Defendant's second objection is GRANTED.

## I.    Background

On May 10, 2022, an information charged Defendant with two counts: "Bank Fraud; Aiding and Abetting," in violation of 18 U.S.C.

§ 1334 (Count 1); and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 2). (ECF No. 15.) On June 23, 2022, Defendant pled guilty to Counts 1 and 2 of the information pursuant to a Rule 11 plea agreement. (ECF No. 26.)

In the plea agreement, the factual basis for Count 1 states:

From on or about January 4, 2019 to or [sic] about January 10, 2019, defendant and others executed a scheme to defraud JP Morgan Chase Bank (JPMC), a financial institution insured by the Federal Deposit Insurance Corporation. The scheme involved stealing a check payable by United Parcel Service and depositing it into a bank account, and thereafter making withdrawals therefrom, under false pretenses. As part of the scheme, a check for $ 608,100 payable by UPS to Bluestem Brands Inc., a company in the state of Minnesota, was diverted from a UPS facility in the state of Georgia, and sent instead to the state of Michigan. Shortly after the check was diverted from Georgia, one or more participants in the scheme created a false company in the state of Michigan called Bluestem Brands Inc., and opened an account for the false Bluestem Brands company at a JPMC branch office in Huntington Woods, Michigan on or about January 4, 2019. On or about January 7, 2019, defendant and another participant in the scheme deposited the stolen UPS check into the account under the materially false pretense, and with the intent to deceive the bank, that they were authorized to do so on behalf of the real Bluestem Brands company for which the check was intended. Thereafter, defendant made a series of withdrawals from the JPMC account on January 9 and 10, 2019, totaling over $ 173,310.

2

(*Id.* at PageID.149–150.)

For Count 1's offense level calculation, the PSR recommends a fourteen-level increase under U.S.S.G. § 2B1.1(b)(1)(H) based on an "intended loss" amount of $608,100.[1] The word "loss" is not defined in § 2B1.1. *See* U.S. Sent'g Guidelines Manual § 2B1.1(b)(1) (U.S. Sent'g Comm'n 2018) [hereinafter U.S.S.G. § 2B1.1(b)(1)]. But § 2B1.1's commentary contains a "General Rule" that "loss is the greater of actual loss or intended loss," and it defines the terms "actual loss" and "intended loss." *Id.* § 2B1.1 cmt. n.3(A)(i)–(ii). The PSR applies the commentary's general rule and its definition of "intended loss" in recommending a fourteen-level increase under § 2B1.1(b)(1)(H).

---

[1] In addition to the 14-level increase, the PSR recommends a base offense level of 7, *see* U.S. Sent'g Guidelines Manual § 2B1.1(a)(1) (U.S. Sent'g Comm'n 2018), and a 2-level increase because "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means," *id.* § 2B1.1(b)(10)(C). These recommendations are not challenged by the parties.

Applying the 14-level increase, the PSR calculates an adjusted offense level of 23 for Count 1, an adjusted offense level of 24 for Count 2, a combined adjusted offense level of 26, and a total offense level of 23. The PSR calculates a criminal history category of V, and the resulting guideline imprisonment range is 84 to 105 months. If Defendant's second objection is granted (and the 14-level increase is not applied), the adjusted offense level for Count 1 would then be 19, the adjusted offense level for Count 2 would remain at 24, the combined adjusted offense level would be 25, and the total offense level would be 22. Defendant's criminal history category would still be V, and the guideline range would be 77 to 96 months.

3

Defendant's second objection concerns this fourteen-level increase. Defendant argues that the "proper consideration" for the offense level computation for Count 1 "is actual loss ($173,000),[2] which would result in an increase of 10 levels, § 2B1.1(b)(1)(F), and not 14 [levels]." (ECF No. 32, PageID.317.) The government argues that the Court should consider the "intended loss" amount of $608,100 and apply § 2B1.1(b)(1)(H)'s fourteen-level increase. (ECF No. 33, PageID.344.) The government indicates that "[t]here is no dispute that $608,100 represents th[e] 'intended loss,' whereas the amount that [Defendant] withdrew from the bank, $173,310, represents the 'actual loss.'" (*Id.* at PageID.339.)

## II.   Legal Standard

The PSR's "Sentencing Guideline recommendations are not binding on the Court." *United States v. Earnest*, 588 F. Supp. 3d 800, 803 (S.D. Ohio 2022). "Within 14 days after receiving the presentence report, the parties must state in writing any objections, including objections to material information, sentencing guideline ranges, and

---

[2] Defendant states that "[t]he loss amount used [in the PSR] ($608,100) includes the amount deposited to [JPMC]"; however, JPMC "refunded the entire $608,100 to the real Bluestem Brands, and was only out approximately $173,000 for the withdrawals made on January 9th and 10th of 2019." (ECF No. 32, PageID.313.)

4

policy statements contained in or omitted from the report." Fed. R.

Crim. P. 32(f)(1). Federal Rule of Criminal Procedure 32(i)(3) provides

in relevant part that

> [a]t sentencing, the court:
>
> (A) may accept any undisputed portion of the presentence
> report as a finding of fact; [and]
>
> (B) must—for any disputed portion of the presentence report
> or other controverted matter—rule on the dispute or
> determine that a ruling is unnecessary either because the
> matter will not affect sentencing, or because the court will
> not consider the matter in sentencing . . . .

Fed. R. Crim. P. 32(i)(3)(A)–(B).

The Sixth Circuit instructs that "the district court must

affirmatively rule on a controverted matter where it could potentially

impact the defendant's sentence." *United States v. White*, 492 F.3d 380,

415 (6th Cir. 2007); *see also United States v. Darwich*, 337 F.3d 645, 667

(6th Cir. 2003) ("[T]he district court had an obligation under Rule

32(i)(3) to issue a ruling on the disputed matter unless the matter

would not affect sentencing or would not be considered in sentencing.").

"[A] Rule 32(i)(3) ruling . . . requires more than blind reliance on the

PSR"; "the PSR cannot be substituted for a ruling on a disputed

matter." *Darwich*, 337 F.3d at 667. The Sixth Circuit's "cases require literal compliance with Rule 32 and mandate that sentencing courts explain their calculation methods, . . . ensuring that defendants are sentenced on the basis of accurate information and provid[ing] a clear record for appellate courts." *United States v. Roberts*, 919 F.3d 980, 988 (6th Cir. 2019) (last alteration in original) (internal quotation marks and citations omitted).

## III.   Analysis

### A. Section 2B1.1(b)(1) and Application Note 3(A)

Section 2B1.1(b)(1) assigns an increase in offense level between zero and thirty based on the dollar amount of the "loss." U.S.S.G. § 2B1.1(b)(1). The guideline states in relevant part:

**(b)** Specific Offense Characteristics

**(1)** If the loss exceeded $6,500, increase the offense level as follows:

| Loss (apply the greatest) | Increase in Level |
| --- | --- |

* * *

(F) More than $150,000 . . . . . . . . . . . . . . . . . . add 10

(G) More than $250,000 . . . . . . . . . . . . . . . . . . add 12

6

* * *

(H) More than $550,000 . . . . . . . . . . . . . . . . . . add 14

(I) More than $1,500,000 . . . . . . . . . . . . . . . . add 16

* * *

_____

*Id.*

In addition, the relevant portion of Application Note 3(A) from

§ 2B1.1's commentary provides:

> **3. Loss Under Subsection (b)(1).**--This application note
> applies to the determination of loss under subsection (b)(1).
>
> **(A) General Rule.**--Subject to the exclusions in
> subdivision (D), loss is the greater of actual loss or
> intended loss.
>
> > **(i) Actual Loss.**--"Actual loss" means the reasonably
> > foreseeable pecuniary harm that resulted from the
> > offense.
> >
> > **(ii) Intended Loss.**--"Intended loss" (I) means the
> > pecuniary harm that the defendant purposely sought to
> > inflict; and (II) includes intended pecuniary harm that
> > would have been impossible or unlikely to occur (e.g.,
> > as in a government sting operation, or an insurance
> > fraud in which the claim exceeded the insured value).

*Id.* § 2B1.1 cmt. n.3(A)(i)–(ii).

7

## B. Deference to the Commentary in the Sixth Circuit

Courts have distinguished the guidelines from the commentary based on them having different procedural requirements. *See United States v. Havis*, 927 F.3d 382, 385–86 (6th Cir. 2019) (en banc) (per curiam). Under the Sentencing Reform Act of 1984, the U.S. Sentencing Commission is tasked with creating the guidelines, and Congress reviews the guidelines and any amendments. *See United States v. Riccardi*, 989 F.3d 476, 483–84 (6th Cir. 2021) ("Congress required the Commission to submit the original guidelines for its review and to give it six months to review all amendments."). Moreover, amendments to the guidelines must "go through notice-and-comment rulemaking." *Id.* at 484. But because the Sentencing Reform Act and its amendments do not mention the commentary, "[t]o amend the commentary, . . . the Commission need not follow the same procedures that govern changes to the substantive rules in the guidelines themselves (congressional review and notice-and-comment rulemaking)." *Id.* (citing *Havis*, 927 F.3d at 386). According to the Sixth Circuit, "[t]hat fact led some circuit courts to hold originally that they were not bound by the commentary's

8

interpretation of the guidelines." *Id.* (citing *Stinson v. United States*, 508 U.S. 36, 39–40, 40 n.2 (1993)).

In *Stinson v. United States*, the Supreme Court "rejected this view" and "held that the commentary's interpretation of a guideline 'must be given []controlling weight unless it is plainly erroneous or inconsistent with the' guideline." *Id.* (quoting *Stinson*, 508 U.S. at 38). The Court "viewed the guidelines as the 'equivalent of legislative rules adopted by federal agencies,'" and "it viewed the commentary as 'akin to an agency's interpretation of its own legislative rules.'" *Id.* (quoting *Stinson*, 508 U.S. at 45). The Court therefore concluded that "the commentary deserved the deference given to an agency's interpretation of its regulations—what was then known as *Seminole Rock* deference but now goes by *Auer* deference." *Id.* (citing *Stinson*, 508 U.S. at 45; *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). The Sixth Circuit notes that "*Stinson* added that the Commission could effectively amend a guideline by amending the commentary so long as 'the guideline which the commentary interprets will bear the [amended] construction.'" *Id.* (alteration in original) (quoting *Stinson*, 508 U.S. at 46).

9

The Sixth Circuit states that

> [o]n its face, *Stinson's* plain-error test seemed to require courts to give great deference to the commentary. By way of analogy, the plain-error test that applies to unpreserved arguments on appeal requires a legal error to "be clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135, 129 S. Ct. 1423, 173 L.Ed.2d 266 (2009). Unsurprisingly, then, we have previously been quick to give "controlling weight" to the commentary without asking whether a guideline could bear the construction that the commentary gave it. *See, e.g.*, *United States v. Ednie*, 707 F. App'x 366, 371–72 (6th Cir. 2017); *United States v. Jarman*, 144 F.3d 912, 914 (6th Cir. 1998).

*Id.*

In *United States v. Riccardi*, the Sixth Circuit adopted a different approach to the commentary based on the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). 989 F.3d at 484–85. In *Kisor*, the Supreme Court stated that it has "cautioned that *Auer* deference is just a 'general rule'; it 'does not apply in all cases.'" 139 S. Ct. at 2414 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). The Court stated that "the possibility of deference can arise only if a regulation is genuinely ambiguous. And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted

to all the standard tools of interpretation." *Id.* "To make that effort, a court must 'carefully consider[]' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* at 2415 (alteration in original) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 706 (1991) (Scalia, J., dissenting)); *see also United States v. Phillips*, No. 21-5762, 2022 WL 17246309, at *4 (6th Cir. Nov. 28, 2022). "If genuine ambiguity remains, . . . the agency's reading must still be 'reasonable'" for *Auer* deference to apply. *Kisor*, 139 S. Ct. at 2415 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)). "Still more, not all reasonable agency constructions of those truly ambiguous rules are entitled to deference." *Id.* at 2414. "[A] court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* at 2416. Under this inquiry, for a court to give *Auer* deference to an agency's interpretation, "the regulatory interpretation must be one actually made by the agency," "the agency's interpretation must in some way implicate its substantive expertise," and "an agency's reading of a rule must reflect 'fair and considered judgment' . . . ." *Id.* at 2416–18 (quoting *Auer*, 519 U.S. at 462).

The Sixth Circuit concluded in *Riccardi* that *Kisor* "[s]hould . . . affect our approach to the commentary." 989 F.3d at 485. Thus, in the Sixth Circuit, "while commentary can help explain a guideline when it is 'genuinely ambiguous,' the guideline text itself is authoritative, and we should follow its plain meaning when the tools of interpretation make it clear." *United States v. Pruitt*, 999 F.3d 1017, 1027 (6th Cir. 2021) (Nalbandian, J., concurring) (quoting *Riccardi*, 989 F.3d at 485–86).

## C. Defendant's Second Objection to the PSR

### i.   *The Parties' Arguments*

Defendant objects to the PSR applying a fourteen-level increase under § 2B1.1(b)(1)(H) based on the commentary's definition of "loss" as including "intended loss." Defendant argues that under Sixth Circuit and Supreme Court precedent, the amount of "loss" for purposes of § 2B1.1(b)(1) is the actual loss ($173,310) and not intended loss ($608,100) because the word "loss" in § 2B1.1(b)(1) is not ambiguous. (*See* ECF No. 32, PageID.314–315.) Defendant states that "[t]he Sixth Circuit recently surveyed dictionaries to determine the meaning of the word 'loss,'" and "[n]one of the[] definitions include[] intended or

12

theoretical loss." (*Id.* at PageID.315.) Defendant's position is that because "loss" is not ambiguous, the commentary—and therefore, the definition of "loss" as including "intended loss"—is not relevant, given that "the commentary is only relevant if the text of the guideline is ambiguous." (*Id.* at PageID.314 (citing *Riccardi*, 989 F.3d at 485).) Defendant also argues that "the commentary 'sweeps more broadly than the plain text of the Guideline' because only the commentary—not the Guideline itself—mentions intended loss." (*Id.* at PageID.315 (quoting *United States v. Kirschner*, 995 F.3d 327, 333 (3d Cir. 2021).) Defendant argues that the commentary's rule that "loss is the greater of the actual loss or intended loss" makes it so that "the commentary differs significantly from the Guideline." (*Id.* at PageID.314.) Defendant therefore believes that the commentary should be disregarded and that ten levels (instead of fourteen) should be added under § 2B1.1(b)(1)(F) due to the amount of actual loss ($173,310).

The government disagrees. The government argues that the Court "should overrule [Defendant's] objection," follow the commentary, "find that the intended loss amount was $608,100, and apply USSG 2B1.1(b)(1)(H)['s]" fourteen-level increase. (ECF No. 33, PageID.344.)

The government argues that the term "loss" in the guideline is "itself elastic and ambiguous." (*Id.* at PageID.340.) It argues that "'[i]ntended loss' is a reasonable interpretation of . . . § 2B1.1(b)(1)." (*Id.* at PageID.343.)

   ii. *"Loss" in § 2B1.1 is not Genuinely Ambiguous*

  Applying the traditional tools of construction, the Court concludes that "loss" in § 2B1.1 is not genuinely ambiguous. As a result, deference to the commentary's definition of "loss" as including "intended loss" is not appropriate.

  In *Riccardi*, the Sixth Circuit instructs that "[w]e . . . do not immediately defer to [an] Application Note"; "[r]ather, we first ask whether [a guideline] is 'genuinely ambiguous.'" 989 F.3d at 486 (quoting *Kisor*, 139 S. Ct. at 2415). "If uncertainty does not exist, there is no plausible reason for deference." *Kisor*, 139 S. Ct. at 2415. "[T]ypically, 'before concluding that a rule is genuinely ambiguous, a court must exhaust all the "traditional tools" of construction.'" *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*, 32 F.4th 548, 558 (6th Cir. 2022) (quoting *Kisor*, 139 S. Ct. at 2415). The Sixth Circuit has stated that "a fundamental canon of statutory

14

construction" that "applies to interpretation of regulatory language" is that "the language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." *Id.* at 557 (quoting *Thompson v. Greenwood*, 507 F.3d 416, 419 (6th Cir. 2007)) (citing *Kisor*, 139 S. Ct. at 2414). "If a regulation's meaning is plain, the court must give . . . 'it effect, as the court would any law,' . . . and the court's inquiry into the regulatory meaning is over . . . ." *Id.* at 557–58 (quoting *Kisor*, 139 S. Ct. at 2415) (citing *In re Laurain*, 113 F.3d 595, 597 (6th Cir. 1997); *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020)).

To determine whether "loss" is ambiguous, "[a]s always, we must start with the text . . . ." *United States v. Hill*, 963 F.3d 528, 532 (6th Cir. 2020). Section 2B1.1(b)(1) states that "[i]f the loss exceeded $6,500, increase the offense level" according to the corresponding number specified in the table. U.S.S.G. § 2B1.1(b)(1). As noted, "loss" is not defined in the guideline.

*Riccardi* considered the meaning of "loss" in § 2B1.1. The court stated:

> Section 2B1.1's language tells courts to "increase the offense level" in incremental amounts based on the amount of the

15

"loss" (measured in dollars). U.S.S.G. § 2B1.1(b)(1). Where, as here, a legal text does not define a term, we generally "give the term its ordinary meaning." *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013); *United States v. Sands*, 948 F.3d 709, 713–14 (6th Cir. 2020). And "dictionaries are a good place to start" to identify the range of meanings that a reasonable person would understand a word like "loss" to have. *Zabawa*, 719 F.3d at 559. One dictionary defines the word to mean, among other things, the "amount of something lost" or the "harm or suffering caused by losing or being lost." *American Heritage Dictionary of the English Language* 1063 (3d ed. 1992). Another says it can mean "the damage, trouble, disadvantage, [or] deprivation . . . caused by losing something" or "the person, thing, or amount lost." *Webster's New World College Dictionary* 799 (3d ed. 1996). A third defines it as "the being deprived of, or the failure to keep (a possession, appurtenance, right, quality, faculty, or the like)," the "[d]imunition of one's possessions or advantages," or the "detriment or disadvantage involved in being deprived of something[.]" 9 *Oxford English Dictionary* 37 (2d ed. 1989).

These definitions show that "loss" can mean different things in different contexts. The word might include emotional harms, as in the statement that the children "bore up bravely under the [loss] of both parents[.]" *Webster's Third New International Dictionary* 1338 (1986). Or it might include just economic harms, as in the statement that my friend was "forced to sell all the stock at a [loss]." *Id.* (Another part of § 2B1.1's commentary does, in fact, read § 2B1.1 as limited to economic harms. *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(iii); *Kozerski*, 969 F.3d at 313.) Even in the economic realm, the word might cover only the precise value

of, say, a gift card that is stolen (the "amount of something lost"). *American Heritage Dictionary*, *supra*, at 1063. Or it might include the costs associated with obtaining a replacement gift card, including the time and expense from a second trip to the store ("the damage, trouble, disadvantage, [or] deprivation . . . caused by losing something"). *Webster's New World College Dictionary*, *supra*, at 799.

*Riccardi*, 989 F.3d at 486 (alterations in original); *see also Pruitt*, 999 F.3d at 1027 (Nalbandian, J., concurring) ("Because the guideline here does not define assault, our goal is to 'give the term its ordinary meaning.'" (quoting *Riccardi*, 989 F.3d at 486)). Yet the Sixth Circuit in *Riccardi* did "not decide whether one clear meaning of the word 'loss' emerges from the potential options after applying 'the "traditional tools" of construction' to § 2B1.1." *Riccardi*, 989 F.3d at 486 (quoting *Kisor*, 139 S. Ct. at 2415).

The Court was unable to find a Sixth Circuit case that addresses whether "loss" in § 2B1.1 is genuinely ambiguous. Outside of the Sixth Circuit, a court in the Northern District of Florida determined in *United States v. Alford*, No. 3:21cr052/MCR, 2022 WL 3577373 (N.D. Fla. Aug. 20, 2022), that "loss" is not genuinely ambiguous. *See id.* at *3. *Alford* considered the definitions of "loss" referenced in *Riccardi* as well as those that appear in "contemporary dictionaries," and it concluded that

17

"loss" is unambiguous in the sense that there "is at least one element shared by *all* of the 'ordinary, contemporary, common meaning[s]' for the word 'loss' in *all* of its various contexts—concrete materialization of harm. There is no reasonable construction of the 'plain and ordinary meaning' of loss that includes harm that did not actually materialize." *Id.* (alteration in original) (internal citation omitted). The court found that "'[l]oss' cannot mean harm that never materialized" and that "the *only* ambiguity is that created by the Sentencing Commission itself by inserting 'intended loss' into the definition of 'loss.'" *Id.* at *3 & n.6. The court concluded that it "'has no business deferring to any other reading' of the term, no matter how much the Government insists that doing so 'would make more sense.'" *Id.* at *3 (quoting *Kisor*, 139 S. Ct. at 2415). The court thus declined to give *Auer* deference to the commentary "defining 'loss' to include 'intended loss.'"[3] *Id.* at *3–4.

---

[3] The court in *United States v. Alford*, No. 3:21cr052/MCR, 2022 WL 3577373 (N.D. Fla. Aug. 20, 2022), reached this conclusion in ruling on a PSR objection that appears to be similar to the objection asserted by Defendant in this case. In *Alford*, the PSR "recommend[ed] a 20-level upward adjustment to [the defendant's] base offense level under U.S.S.G. § 2B1.1(b)(1)(K) . . . based on a loss amount of $25,000,000," and the defendant "object[ed] to the use of 'intended loss' to determine his offense level under the Guidelines, as opposed to the actual loss amount of zero." *Id.* at *1. On August 20, 2022, the court issued its order (discussed above) sustaining the defendant's objection and declining to give *Auer* deference to the

In addition, the Third Circuit concluded in *United States v. Banks*, Nos. 19-3812 & 20-2235, 2022 WL 17333797 (3d Cir. Nov. 30, 2022), that "the term 'loss' is unambiguous in the context of § 2B1.1." *Id.* at *3. That court's analysis "beg[a]n with the plain text of § 2B1.1." *Id.* at *6. The court stated that "[t]he Guideline does not mention 'actual' versus 'intended' loss; that distinction appears only in the commentary. That absence alone indicates that the Guideline does not include intended loss." *Id.* Moreover, the court found that "dictionary definitions of 'loss'" from *Webster's Dictionary* and in *Riccardi* "confirm[]" that "[t]he ordinary meaning of 'loss' in the context of § 2B1.1 is 'actual loss.'" *Id.* The court found that "[n]one of these definitions suggest an ordinary understanding that 'loss' means 'intended loss.'" *Id.* at *7. It concluded that "in the context of a sentence enhancement for basic economic

commentary on "intended loss." *See id.* at *1, *4. On August 22, 2022, the court issued an order vacating its prior order and overruling the defendant's objection. *See United States v. Alford*, No. 3:21-cr-00052-MCR (N.D. Fla. Aug. 22, 2022), ECF No. 56. The court vacated its prior order not because of the intended loss analysis but because the sentence it imposed was "largely . . . due to [the defendant's] criminal history" and "would be the same" regardless of "whether [the court] imposed a sentence under the guidelines with the intended loss at 20 levels or without the intended loss." Tr. of Sent'g Hr'g at 67, *United States v. Alford*, No. 3:21-cr-00052-MCR (N.D. Fla. Aug. 22, 2022), ECF No. 68. The court stated during the sentencing hearing on August 22, 2022 that it is "still persuaded that the guideline is not ambiguous with the term 'loss' and therefore we shouldn't turn to the commentary." *Id.* at 4.

offenses, the ordinary meaning of the word 'loss' is the loss the victim actually suffered." *Id.* The court therefore "accord[ed] the commentary no weight." *Id.*

The Court finds the analysis and conclusion in *Alford*[4] and *Banks* persuasive. Based on *Riccardi*'s discussion of the definitions of "loss," as well as the Court's own research, "loss" in § 2B1.1 is not genuinely ambiguous. *See, e.g.*, *Loss, Merriam-Webster Unabridged Dictionary*, https://unabridged.merriam-webster.com/unabridged/loss (last visited Dec. 8, 2022) (defining "loss" as including "the act or fact of losing," "failure to keep possession," or "deprivation" and "the harm or privation resulting from losing or being separated from something or someone"); *Loss,                Oxford                Dictionaries*,

---

[4] That the court in *Alford* vacated its order sustaining the defendant's objection, *see supra* note 3, does not prevent this Court from considering that decision for guidance. *See Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 315 (6th Cir. 2021) ("As with unpublished decisions, out-of-circuit cases are not binding, but may be considered."); *see also Barrett v. Harrington*, 130 F.3d 246, 258 n.18 (6th Cir. 1997) ("Because this Court only looks to the case as persuasive authority, it is irrelevant that the case has been vacated; the case occurred in the Tenth Circuit and therefore this Court would not be bound by the decision even if it had not been vacated."); *Mattei v. Mattei*, 126 F.3d 794, 801 (6th Cir. 1997) ("find[ing] persuasive . . . the reasoning in [a] vacated and unpublished decision"); *Smith v. Astrue*, 639 F. Supp. 2d 836, 842 (W.D. Mich. 2009) (indicating that "persuasive authority" includes "decisions by our district courts, unpublished decisions of the Sixth Circuit, or *any* decisions from outside our circuit, published or otherwise").

https://premium.oxforddictionaries.com/us/definition/american_english/l oss (last visited Dec. 8, 2022) (defining "loss" as including "[t]he fact or process of losing something or someone"); *Loss*, *Oxford English Dictionary* (2nd ed. 1989), https://www.oed.com/oed2/00135806 (last visited Dec. 8, 2022) (defining "loss" as including "a person, thing, or amount lost"). As Defendant argues, "[n]one of the[] definitions include[] intended or theoretical loss." (ECF No. 32, PageID.315.) Nor do they include a loss that has not occurred. And there is no question or dispute that the loss at issue in this case—and in § 2B1.1(b)(1)—is of a financial nature. *See* U.S.S.G. § 2B1.1(b)(1).

The guideline's purpose is not at odds with an interpretation of § 2B1.1 that affords "loss" its plain meaning. From examining § 2B1.1(b)(1), it appears that the purpose of the guideline is to impose higher sentences for offenses that involve greater amounts of harm. Nothing in § 2B1.1(b)(1)'s table or in the plain language of the guideline indicates that individuals should be penalized for potential harm that has not occurred.[5]

---

[5] The government states in a supplemental filing that "loss" in § 2B1.1 "must be viewed in light of the guidelines [sic] over-arching purpose to promote a 'fair sentencing system' characterized by 'reasonable uniformity' with 'appropriately

Inserting the word "intended" before the word "loss" changes the meaning of "loss" in a way that departs from its plain meaning. Because "intended" does not appear before "loss" in the guideline, the Court adheres to the plain meaning of the word "loss," which involves materialized harm. To the extent the Sentencing Commission wants courts to consider "intended loss" when applying § 2B1.1(b)(1), "the Commission should . . . achieve[] that objective by changing the guideline's text." *United States v. Tate*, 999 F.3d 374, 390 (6th Cir. 2021) (Murphy, J., concurring), *cert. denied*, 142 S. Ct. 912 (2022). The Commission now can do so, given that "[t]he US Senate . . . [recently] confirmed a group of seven bipartisan members to serve on the US Sentencing Commission, providing the independent judicial branch agency with a voting quorum for the first time in more than three years." *Acting Chair Judge Charles Breyer, Incoming Chair Judge Carlton W. Reeves Applaud Senate Confirmation of New Commissioners*,

---

different sentences for criminal conduct of differing severity.' USSG Ch. 1, Pt. A, intro. 1, subpart 3." (ECF No. 36, PageID.457.) The government also states that "loss" in § 2B1.1 is "'a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.' USSG § 2B1.1, comment. (backg'd.)." (*Id.*) However, the government fails to explain why these statements demonstrate that "loss" in § 2B1.1 is genuinely ambiguous.

U.S.       Sent'g       Comm'n       (Aug.       5,       2022), https://www.ussc.gov/about/news/press-releases/august-5-2022;       *cf.* *Organization*, U.S. Sent'g Comm'n, https://www.ussc.gov/about/who-we-are/organization (last visited Dec. 8, 2022) ("The affirmative vote of at least four [out of the seven voting] members of the Commission is required to promulgate amendments to the sentencing guidelines.").

Because "loss" in § 2B1.1 is not genuinely ambiguous, deference to the commentary is not appropriate. Therefore, the Court will not consider the commentary's definition of "loss" as including "intended loss" in applying § 2B1.1.

The government's arguments in its sentencing memorandum do not compel a different conclusion. The government argues that the term "loss" in § 2B1.1 is "elastic and ambiguous" because *Riccardi* "described numerous different definitions of loss" and "explained[] that 'loss can mean different things in different contexts.'" (ECF No. 33, PageID.340–342 (stating that *Riccardi* "painstakingly outlined the many possible definitions of the term 'loss,' emphasizing its ambiguity").) The government adds that "[a] review of the online source 'dictionary.com' yields six definitions of the term." (*Id.* at PageID.341.) But just because

23

a word has multiple dictionary definitions does not make it ambiguous. And *Riccardi* did not reach a conclusion as to whether "loss" in § 2B1.1 is "genuinely ambiguous." The Court recognizes that "loss" has more than one definition and "can mean different things in different contexts," *Riccardi*, 989 F.3d at 486; however, the Court finds that the definitions of "loss" share "at least one element": "concrete materialization of harm." *Alford*, 2022 WL 3577373, at *3. The government does not address this commonality or provide a basis for the Court to reject this interpretation of "loss."

The government also argues that "the Sixth Circuit . . . held [in *United States v. Murphy*, 815 F. App'x 918, 924 (6th Cir. 2020),] that the commentary's inclusion of intended loss is a reasonable interpretation of the term 'loss' in § 2B1.1." (ECF No. 33, PageID.341.) In addition, the government quotes *United States v. Skouteris*, 51 F.4th 658, 672 (6th Cir. 2022), in arguing that "the Sixth Circuit has 'repeatedly blessed intended loss calculations based on the face value of a fraudulently deposited check.'" (ECF No. 33, PageID.341–342.) The government states that "other circuits have routinely held that the intended loss commentary provision is entitled to deference." (*Id.* at

24

PageID.343 (citing *United States v. Crowe*, 735 F.3d 1229, 1237 (10th Cir. 2013); *United States v. Nagle*, 803 F.3d 167, 179 (3d Cir. 2015); *United States v. Dowl*, 619 F.3d 494, 502 (5th Cir. 2010)).) These arguments lack merit.

The government correctly notes that *Murphy* deferred to the commentary defining "loss" in § 2B1.1 because the court found it to be "consistent with the construction of the Guidelines as an interpretation of, rather than an addition to, § 2B1.1(b)." 815 F. App'x at 924. However, *Murphy* is a pre-*Riccardi* decision relying on *Stinson*, *see id.*, that "did not address *Kisor*'s recent clarification about the limited nature of *Auer*," *Riccardi*, 989 F.3d at 488. Specifically, *Murphy* did not consider whether the word "loss" in § 2B1.1 is "genuinely ambiguous" for purposes of determining whether to apply *Auer* deference to the commentary, as is now required by *Kisor* and *Riccardi*. Instead, *Murphy* addresses whether the commentary's interpretation of "loss" is reasonable. Under *Kisor*, reasonableness is a consideration that arises only "[i]f genuine ambiguity remains." 139 S. Ct. at 2415. Here, no "genuine ambiguity" exists, so a reasonableness inquiry is beyond the scope of the Court's analysis.

The other cases that the government cites also do not apply *Kisor* and *Riccardi*. Although *Skouteris* was decided after *Riccardi*, it did not engage in any substantive *Kisor-Riccardi* analysis. *Skouteris* merely "assume[d] that the commentary permissibly interprets the term 'loss' as 'intended loss'" because the parties did not contest this interpretation. 51 F.4th at 672. Moreover, the three out-of-circuit cases that the government cites pre-date *Kisor* and *Riccardi* and apply *Stinson*'s plain-error standard. *See Crowe*, 735 F.3d at 1237; *Nagle*, 803 F.3d at 179; *Dowl*, 619 F.3d at 502. These cases involve a dispute about how to calculate loss amount under § 2B1.1(b), which is not at issue in this case. *See Crowe*, 735 F.3d at 1241; *Nagle*, 803 F.3d at 180–81; *Dowl*, 619 F.3d at 502. Here, the parties agree on the actual loss and intended loss amounts, as noted above. (*See* ECF No. 33, PageID.339.)

In sum, the Court concludes that the word "loss" in § 2B1.1 is not "genuinely ambiguous." *Kisor*, 139 S. Ct. at 2414–15. Accordingly, the Court does not defer to the commentary and its definition of "loss" as including "intended loss." Defendant's second objection is granted, and the Court applies the ten-level increase under § 2B1.1(b)(1)(F) based on a loss amount of $173,310.

26

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS Defendant's second objection to the PSR. The adjusted offense level for Count 1 is 19, and the adjusted offense level for Count 2 remains at 24. The resulting combined adjusted offense level is 25, and the resulting total offense level is 22. Defendant's criminal history category remains at V. As such, Defendant's guideline range is 77 to 96 months.

IT IS SO ORDERED.

Dated: December 9, 2022                 s/Judith E. Levy
      Ann Arbor, Michigan          JUDITH E. LEVY
                                       United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 9, 2022.

                                       s/William Barkholz
                                       WILLIAM BARKHOLZ
                                       Case Manager